In re the Marriage of:

Julia M. Meyer, Petitioner-Respondent,†

v.

Joseph D. Meyer, Respondent-Appellant.

Court of Appeals

*No. 99–0178. Submitted on briefs September 10, 1999.—Decided December 9, 1999.*

## 2000 WI App 12

(Also reported in 606 N.W.2d 184.)

†Petition to review granted.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Daniel P. Ryan* of *Noble & Ryan, S.C.* of La Crosse.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Mary Anne Kircher* and

*Sabina Bosshard* of *Bosshard & Associates* of La Crosse.

Before Dykman, P.J., Eich and Deininger, JJ.

¶ 1. DYKMAN, P.J. Joseph D. Meyer appeals from a judgment of divorce awarding his wife, Julia M. Meyer, $1,700 per month in maintenance payments for eight years. Joseph asserts that the trial court erroneously exercised its discretion by considering Julia and his non-marital relationship when it made its maintenance determination. We agree. Therefore, we reverse and remand with instructions to exclude consideration of Julia and Joseph's premarital relationship from the maintenance decision. Joseph also argues that the trial court cannot, in the alternative, base its award on Julia's claim for unjust enrichment. Because a medical degree is not an asset for purposes of an unjust enrichment claim, we agree.

## I. Background

¶ 2. Julia and Joseph met in March of 1985 in Green Bay. At the end of that summer, Joseph began attending college at the University of Wisconsin-Green Bay. He began spending the night at Julia's apartment in Green Bay in February 1986. While Joseph attended school, Julia worked, first as a nurse, and then, beginning in December 1988, as a claims examiner at an insurance company. Joseph worked during the summers while in college, but Julia testified that she paid all of the rent, telephone and utility expenses for her apartment.

¶ 3. In August 1989, Julia and Joseph moved to Milwaukee so that he could attend medical school. In their first year in Milwaukee, they rented an apart-

ment together, but in 1990 they moved into a house. Joseph testified that his mother purchased the house and that he and Julia made monthly payments to his mother out of their joint checking account. In 1992, Joseph and Julia purchased a duplex, and lived in one half while renting out the other half. While Joseph attended medical school, Julia continued to work in the insurance industry. She testified that she also did the majority of the housework and ran all of the household errands. Joseph paid for his college and medical school tuition and books with loans.

¶ 4. Julia and Joseph married in May 1993. Joseph graduated from medical school in 1994. In May of that year, he and Julia moved to La Crosse so that he could begin his residency program. After their first child was born, Julia began working for an insurance company in La Crosse. She also took primary responsibility for caring for their child. Joseph completed his residency in 1997 and began working as an urgent care doctor at a clinic in La Crosse.

¶ 5. In June 1997, Julia filed a petition for divorce. In September 1998, she filed an amended petition for divorce to include a claim for unjust enrichment based on her support of Joseph while he obtained his medical degree. The trial court concluded that if Julia proved the elements of unjust enrichment, it would address Julia's premarital support of Joseph and resolve the unjust enrichment claim within the divorce.

¶ 6. At trial, Julia testified that, before she met Joseph, she intended to go back to school to get a degree in business administration. After she became seriously involved with Joseph, she said her plans changed. She testified that she knew that they could not both go to school full time and that she understood that, based on

the commitment they made to each other, they would both benefit once he began earning a doctor's salary. Julia asked the trial court to award her $2,400 per month in maintenance for five years.

¶ 7. At the close of trial, the court granted the judgment of divorce. It did not make a specific ruling on Julia's unjust enrichment claim. The court stated that while

> an unjust enrichment claim may be held because I do not believe that a piece of property is necessary . . . I do believe that, standing by itself, the contribution of Mrs. Meyer to the education, training, and increased earning capacity of Dr. Meyer is sufficient without the unjust enrichment claim to provide her some compensation under a fairness and equity argument in this case.

¶ 8. The court awarded Julia $1,700 per month in maintenance for a period of eight years. It reasoned that $1,700 per month would allow Julia to support herself and her child, and to go to school. The court explained:

> I'm satisfied that $1,700 is a reasonable sum to award for maintenance, taking into consideration all of the factors which this Court must consider, including the contribution which she has provided to his earning capacity.
> The length of the support—Dr. Meyer is correct that this is only a four-year marriage for these parties. And under what would normally be looking at this strictly by the numbers type of situation, the child support—or the maintenance would not be for a long period of time.
> . . . .
> But these parties, based upon my findings, have cohabited for the major part of 1987, '88, '89,

'90, '91, '92, '93, '94, '95 and '96. So that's approximately ten years. Some of that they were married. Some of that they were not. But, in taking into consideration the total consequences of how they came together and the length of period of time they were together and the contribution that she has made to this marriage, the Court is satisfied that a maintenance award in the amount of [$1,700] for a period of eight years is a reasonable award.

Joseph appeals.

## II. Analysis

### A. Maintenance Award

■
¶ 9. Joseph contends that the trial court erred by considering Julia and his non-marital relationship in making its maintenance decision. The determination of the amount and duration of maintenance rests within the discretion of the trial court. *See Olski v. Olski*, 197 Wis. 2d 237, 242 n.2, 540 N.W.2d 412, 414 n.2 (1995). We will not overturn a trial court's maintenance decision unless the court erroneously exercised its discretion by failing to consider relevant factors, basing its award on factual errors, making an error of law, or granting an excessive or inadequate award. *See id.*

■
¶ 10. In *Watts v. Watts*, the supreme court held that Wisconsin's property division statute, § 767.255, STATS., did not extend to unmarried cohabitants. *Watts v. Watts*, 137 Wis. 2d 506, 517–18, 405 N.W.2d 303, 308 (1987). The court noted that the legislature intended the Family Code to apply, "for the most part, to those couples who have been joined in marriage according to

law." *Id.* at 519, 405 N.W.2d at 309. The court concluded:

> Furthermore, the Family Code emphasizes marriage. The entire Family Code, of which ch. 767 is an integral part, is governed generally by the provisions of sec. 765.001(2), which states in part that "[i]t is the intent of chs. 765 to 768 to promote the stability and best interests of *marriage and the family . . . . Marriage* is the institution that *is the foundation of family and of society.* Its stability is basic to morality and civilization, and of vital interest to society and the state." (Emphasis supplied.) Section 765.001(3) further states that "[c]hapters 765 to 768 shall be liberally construed to effect the objectives of sub. (2)." The conclusion is almost inescapable from this language in sec. 765.001(2), (3) that the legislature not only intended chs. 765–768 to protect and promote the "family," but also intended "family" to be within the "marriage" context.[10]

---

[10] When the legislature abolished criminal sanctions for cohabitation in 1983, it nevertheless added a section to the criminal code stating that while the state does not regulate private sexual activity of consenting adults, the state does not condone or encourage sexual conduct outside the institution of marriage. The legislature adopted the language of sec. 765.001 that "[m]arriage is the foundation of family and society. Its stability is basic to morality and civilization, and of vital interest to society and this state." Sec. 944.01, Stats. 1985–86.

*Id.* at 518–19, 405 N.W.2d at 308–09. We cannot conclude that, despite this holding in *Watts,* the Family Code somehow applies to the Meyers' cohabitation period.

¶ 11. Based on *Watts*, in *Greenwald v. Greenwald*, we concluded that one spouse's premarital contributions to the other spouse's estate was not relevant to a maintenance claim. *Greenwald v. Greenwald*, 154 Wis. 2d 767, 790, 454 N.W.2d 34, 42–43 (Ct. App. 1990). In *Greenwald*, a retired widower hired a housekeeper, who lived with him for ten years while taking care of his home before the two married. *Id.* at 776–77, 454 N.W.2d at 37. We decided that *Watts* precluded the trial court from considering the contributions the housekeeper made during the ten-year premarital relationship in its maintenance determination. *See id.* at 789–90, 454 N.W.2d at 42–43.

¶ 12. In *Greenwald*, we did not simply affirm a trial court's discretionary determination. We did not say in *Greenwald*, "The trial court did not erroneously exercise its discretion when it did not consider Josephine's premarital contributions." Instead, we held as a matter of law that a trial court may not consider premarital contributions in its maintenance and property division determinations. We said:

> Although *Watts* did not present a maintenance claim, we are persuaded that *Watts* also *requires* us to reject Josephine's claim that her premarital contribution to Darwin's estate is a relevant factor on her maintenance claim. After examining the Family Code's legislative history in *Watts,* the supreme court concluded that the code did not govern property divisions between unmarried cohabitants. We conclude that this same reasoning applies with equal force to Josephine's maintenance claim.

*Id.* at 790, 454 N.W.2d at 42–43 (emphasis added). We conclude that the trial court erroneously exercised its

discretion by considering Julia and Joseph's pre-marital relationship when it made its maintenance determination, contrary to our holding in *Greenwald*.

¶ 13. Julia argues that the trial court's reasoning was correct because, under *Wolski v. Wolski*, 210 Wis. 2d 183, 565 N.W.2d 196 (Ct. App. 1997), if a couple has been together for a long period, it would be unfair not to consider the entire time they were together in making a maintenance award. However, in *Wolski*, the parties were married for nearly twenty years, got divorced, remarried for another three years, and then divorced again. *Id.* at 186, 565 N.W.2d at 197. We held that "[w]hen parties have been married to one another more than once, a trial court, in its exercise of discretion, can properly look at the total number of years of the marriage when considering maintenance for one of the parties." *Id.* at 192, 565 N.W.2d at 199. *Wolski* applies only to years of marriage. It does not allow a trial court to consider the time a couple cohabits.

## B. Unjust Enrichment

¶ 14. The trial court did not base its decision on Julia's unjust enrichment claim. However, the parties have briefed whether the trial court could have done so and we will address the issue.

¶ 15. Joseph argues that the trial court incorrectly concluded that, in the absence of its maintenance decision, it could have based its award on Julia's unjust enrichment claim. In Wisconsin, "unmarried cohabitants may raise claims based upon unjust enrichment following the termination of their relationships where one of the parties attempts to retain an unreasonable amount of the property acquired through the efforts of both." *Watts*, 137 Wis. 2d at 532–33, 405 N.W.2d at 314.

The elements of unjust enrichment are: "(1) a benefit conferred on the defendant by the plaintiff, (2) appreciation or knowledge by the defendant of the benefit, and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable for the defendant to retain the benefit." *Id.* at 531, 405 N.W.2d at 313.

¶ 16. We have interpreted the theory of unjust enrichment to require "that the complaining party present proof of specific contributions that directly led to an increase in assets or an accumulation of wealth." *Ward v. Jahnke*, 220 Wis. 2d 539, 547–48, 583 N.W.2d 656, 660 (Ct. App. 1998). Thus, in a non-marital cohabitation situation, for the complaining party to recover under an unjust enrichment claim, he or she must demonstrate: "(1) an accumulation of assets, (2) acquired through the efforts of the claimant and the other party and (3) retained by the other party in an unreasonable amount." *Waage v. Borer*, 188 Wis. 2d 324, 329–330, 525 N.W.2d 96, 98 (Ct. App. 1994). Whether the facts of this case satisfy the legal standard for unjust enrichment is a question of law that we review de novo. *See id.* at 328, 525 N.W.2d at 98.

¶ 17. Joseph asserts that Julia's unjust enrichment claim cannot succeed because she has not shown an accumulation of assets. He points out that Julia's claim is based on her support while he obtained a medical degree. In *Dewitt v. Dewitt*, we concluded that a trial court could not value a law degree as an asset to be included in a marital estate. *DeWitt v. DeWitt*, 98 Wis. 2d 44, 53, 296 N.W.2d 761, 765 (Ct. App. 1980). Joseph argues that, similarly, in an unjust enrichment case, an educational degree does not meet the requirement

of showing an increase in assets or an accumulation of wealth.

¶ 18. Julia argues that *DeWitt* is inapplicable in this case. She points out that in *Lundberg v. Lundberg*, 107 Wis. 2d 1, 318 N.W.2d 918 (1982), and *Roberto v. Brown*, 107 Wis. 2d 17, 318 N.W.2d 358 (1982), the supreme court held "that *DeWitt*, which involved the [divorce] statutes as they existed prior to the 1977 Divorce Reform Act, was not controlling for cases arising after the Act." *Id.* at 22, 318 N.W.2d at 360. In *Lundberg*, the court stated that, in that case, a medical degree was "[i]n a sense . . . the most significant asset of the marriage." *Lundberg*, 107 Wis. 2d at 14, 318 N.W.2d at 924. It concluded that, when one spouse supports the other spouse through school, the first spouse can be compensated through property division and maintenance. *See id.* at 10, 318 N.W.2d at 922.

¶ 19. We agree with Joseph that a degree is not an asset for purposes of unjust enrichment. Although *DeWitt* involved the valuation of a degree as an asset within a marital estate, our reasoning in that case also applies in cases of unjust enrichment. In *DeWitt*, we pointed to the difficulty of placing a value on a degree:

> Whether a professional education is and will be of future value to its recipient is a matter resting on factors which are at best difficult to anticipate or measure. A person qualified by education for a given profession may choose not to practice it, may fail at it, or may practice in a specialty, location or manner which generates less than the average income enjoyed by fellow professionals. The potential worth of the education may never be realized for these or many other reasons.

*DeWitt*, 98 Wis. 2d at 58, 296 N.W.2d at 768 (footnote omitted). It would be difficult for the trial court to fairly estimate the value of Joseph's medical degree in order to evaluate Julia's unjust enrichment claim. Although Joseph used his medical degree to obtain work as a doctor at a clinic with a fixed salary, it would be unfair to use that salary as a basis for valuing his degree because there is no guarantee that he will keep that job or its salary.

¶ 20. Our holding in *DeWitt* is exemplified in this case. The trial court made no determination that Joseph's degree was or was not property. It did not value the degree. Julia's expert witness illustrated our concern in *DeWitt*. Depending upon the method he used, the expert valued Julia's loss or Joseph's benefit as between $47,543 and $522,861. Though legally trained persons are comfortable with making or approving an award somewhere between these values, most members of the lay public would view such an award as something akin to a lottery.

¶ 21. We do not agree with Julia that *Lundberg* and *Roberto* have rendered our conclusion in *DeWitt* inapplicable in this case. In *Lundberg* and *Roberto*, the supreme court concluded that the changes to the divorce statutes brought by the 1977 Divorce Reform Act gave a trial court the flexibility to compensate a spouse who supported the other spouse through school. *Lundberg*, 107 Wis. 2d at 9–10, 318 N.W.2d at 922. Thus, the court concluded that our holding in *DeWitt* did not apply to cases arising after the Divorce Reform Act. *See Roberto*, 107 Wis. 2d at 22, 318 N.W.2d at 360. However, an unjust enrichment claim is an action in "quasi contract." *See Watts*, 137 Wis. 2d at 530, 405 N.W.2d at 313. It is not an action based on divorce laws. A change in the divorce statutes does not render

our reasoning in *DeWitt* inapplicable to a claim based upon unjust enrichment. In *Lundberg* and *Roberto*, the supreme court did not address whether an educational degree could be considered an asset. *DeWitt* remains the only case to address that issue.

¶ 22. *Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246, 256 (1997), holds that the court of appeals lacks subject matter jurisdiction to overrule, modify or withdraw language from one of its published opinions.[1] Only the supreme court has the power to overrule or modify *DeWitt*. Because placing a value on a degree would be as difficult here as it was in *DeWitt*, we conclude that Julia cannot state a claim for unjust enrichment based on her contributions to Joseph's medical degree.[2]

¶ 23. The court of appeals is primarily an error correcting court. *See State ex rel. Swan v. Elections Board*, 133 Wis. 2d 87, 94, 394 N.W.2d 732, 735 (1986).

---

[1] Subject matter jurisdiction is the power of a court to hear and decide a particular case or controversy. *See P.C. v. C.C.*, 161 Wis. 2d 277, 297, 468 N.W.2d 190, 198 (1991).

[2] Our conclusion comports with other Wisconsin cases involving claims of unjust enrichment based on personal relationships. In those cases, when the claimant successfully stated a claim for unjust enrichment, it involved quantifiable assets. *See Lawlis v. Thompson*, 137 Wis. 2d 490, 492–93, 405 N.W.2d 317, 317 (1987) (cash transfers made to the other party); *Watts v. Watts*, 137 Wis. 2d 506, 514, 405 N.W.2d 303, 307 (1987) (increase in personal and business wealth); *Ward v. Jahnke*, 220 Wis. 2d 539, 550–51, 583 N.W.2d 656, 661 (Ct. App. 1998) ($11,000 down payment on a house). *Cf. Waage v. Borer*, 188 Wis. 2d 324, 330–31, 525 N.W.2d 96, 98–99 (Ct. App. 1994) (holding that a claim for unjust enrichment cannot be based on unfulfilled emotional expectations with no proof of accumulated assets).

We are bound by both the prior decisions of this court, *see Cook*, 208 Wis. 2d at 190, 560 N.W.2d at 256, and of the supreme court, *see State v. Olsen*, 99 Wis. 2d 572, 583, 299 N.W.2d 632, 638 (Ct. App. 1980). The supreme court, *see Swan*, 133 Wis. 2d at 93–94, 394 N.W.2d at 735, and the legislature, *see Rice v. City of Oshkosh*, 148 Wis. 2d 78, 91, 435 N.W.2d 252, 257 (1989), are the governmental bodies designed and authorized to decide the public policy of the State of Wisconsin. There are few issues as policy laden as the proper place of cohabitants in Wisconsin law. The supreme court recognized the nature of this issue in *Watts*, 137 Wis. 2d at 517 n.6 and 519 nn.10–11, 405 N.W.2d at 308 n.6 and 309 nn.10–11. Cohabitation, whether government should recognize cohabitants in the same way it recognizes married couples, whether the sexual orientation of cohabitants is relevant in a divorce setting, and whether cohabitants should be permitted to divorce each other are topics debated with fervor in today's society. This court is not the place to decide the public policy regarding these issues. We reject the entreaties of Julia and the dissent to do so.

¶ 24. For the reasons discussed above, we reverse. We remand with directions to exclude the time the parties cohabited from the trial court's maintenance determination, and for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded with directions.

¶ 25. DEININGER, J. (*dissenting*). I cannot join in the disposition ordered by the majority. The result reached is not, in my view, required by existing precedent, and it replicates the unfairness the supreme

court described and sought to avoid in *Watts v. Watts*, 137 Wis. 2d 506, 405 N.W.2d 303 (1987):

> [A]llowing no relief at all to one party in a so-called "illicit" relationship effectively provides total relief to the other, by leaving that party owner of all the assets acquired through the efforts of both. Yet it cannot seriously be argued that the party retaining all the assets is less "guilty" than the other. Such a result is contrary to the principles of equity. Many courts have held, and we now so hold, that unmarried cohabitants may raise claims based upon unjust enrichment following the termination of their relationships where one of the parties attempts to retain an unreasonable amount of the property acquired through the efforts of both.

*Id.* at 532–33, 405 N.W.2d at 314 (footnote omitted).

¶ 26. I acknowledge our obligation to follow and apply the holdings of previously published opinions of this court. *See Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246, 256 (1997). I conclude, however, that neither *Greenwald v. Greenwald*, 154 Wis. 2d 767, 454 N.W.2d 34 (Ct. App. 1990), nor *DeWitt v. DeWitt*, 98 Wis. 2d 44, 296 N.W.2d 761 (Ct. App. 1980), upon which the majority relies, requires the result the majority reaches.

¶ 27. There is no dispute that Julia Meyer contributed mightily to her husband's attainment of his medical degree, both financially and through the contribution of her homemaking services and moral support over the ten-year span encompassing Joseph's undergraduate and medical studies and his internal medicine residency. Then, just as the couple was poised to begin reaping the rewards of their decade of mutual hard work and sacrifice, in the form of Joseph's $125,000 salary as a physician, they divorced.

¶ 28. The majority's reading of the prior decisions of this court creates a cruel Catch–22 for Julia.[1] Because the couple did not marry until 1993, the trial court is directed to give no consideration whatsoever in its maintenance determination to the first seven years of Julia's contributions to Joseph's education and increased earning capacity. But, the relief that would ordinarily be available to an unmarried person in Julia's position, recovery for her contributions under an unjust enrichment theory, must also be denied her because the fruit of her labors was Joseph's increased earning capacity represented by his medical degree, instead of the accumulation of more tangible assets. I disagree with both propositions.

¶ 29. I conclude that the trial court did not erroneously exercise its discretion in awarding Julia maintenance in the amount of $20,400 per year for eight years, given the facts before it. The trial court's award was explicitly based on both support and fairness considerations. The award is sustainable on the basis of numerous factors under § 767.26, STATS., including the educational level of the parties at the inception and end of their marriage; the disparity in their earning capacities; the time needed for Julia to increase her earning capacity and improve her prospects for a comparable standard of living; the parties' mutual agreement, express or implied, before and during the marriage, whereby Julia made financial and service contributions to Joseph "with the expectation of reciprocation or other compensation in the future"; and Julia's contributions to Joseph's education and

[1] A "Catch–22" is "a frustrating situation in which one is trapped by contradictory regulations or conditions." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 327 (2d ed. 1987).

increased earning power. *See* § 767.26(4)–(9). In my view, the fact that the trial court considered the seven years of contributions Julia made to Joseph's education and increased earning power prior to their marriage does not so taint the maintenance award that it must be reversed.

¶ 30. Reversal of the maintenance award is required by neither statute nor case law. I note first, as did the trial court, that several of the relevant statutory factors are not explicitly limited to occurrences during the marriage. In particular, the last two factors, § 767.26(9) and (10), STATS. ("[t]he contribution by one party to education . . . or increased earning power of the other," and "[s]uch other factors as the court may . . . determine to be relevant"), are not limited to post-marriage events. The majority believes, however, that we are compelled by our holding in *Greenwald* to limit a trial court's application of the statutory factors to events occurring only during the marriage. I disagree.

¶ 31. Our discussion of the issue in *Greenwald* appears to be dicta. The discussion was not necessary to our disposition of the appeal—the reversal and remand of the trial court's property division ruling, with a direction to also reconsider maintenance in view of the new property division. But even if the *Greenwald* discussion is binding precedent, it does not require us to reverse the present maintenance determination. Our conclusion in *Greenwald* was that the trial court did not err when it "refused to consider [the wife]'s premarital contributions in support of her . . . maintenance . . . claim[ ]." *Greenwald,* 154 Wis. 2d at 789, 454 N.W.2d at 42.[2] But our conclusion in *Greenwald* that

[2] "[T]he trial court refused to consider Josephine's premarital contributions in support of her and [sic] maintenance and property division claims. We affirm the court's ruling." *Green-*

the trial court properly declined to consider premarital contributions when setting maintenance, does not require us to now hold that a trial court, in the exercise of its discretion, and regardless of the facts before it, may never give any consideration to one spouse's premarital contributions to the other's education and increased earning capacity.

¶ 32. The factual differences between *Greenwald* and the present case are substantial. There, a seventy-year-old widower engaged the housekeeping services of a "twice divorced" woman "in her late 50's." *Id.* at 776, 454 N.W.2d at 37. She moved into the man's home and received free room and board in exchange for part-time housekeeping services, while she continued full-time employment outside the residence for some eight years. The woman "oftentimes proposed marriage," but the man declined, wishing to preserve his estate for his own children. *Id.* Ultimately, however, and under the terms of a premarital agreement that served to keep each party's property separate and free from the claims of the other, the parties married when they were sixty-seven and eighty-one, respectively. Three years later, the wife filed for divorce and asked that the marital property agreement be set aside. *See id.* at 776–78, 454 N.W.2d at 37–38.

¶ 33. There is nothing in our recitation of the facts in *Greenwald* to suggest that the wife contributed in any significant way, either before or during the marriage, to the accumulation of assets or to the increased earning power of the husband. In fact, the opposite is implied, given that the husband had retired and accumulated substantial assets before the relationship began. *See id.* One could also infer from our discussion

*wald v. Greenwald,* 154 Wis. 2d 767, 789, 454 N.W.2d 34, 42 (Ct. App. 1990).

of the facts in *Greenwald*, and from our conclusion that the marital property agreement was substantively fair, that we considered the wife to have received fair compensation under the agreement for the contributions she made to the household, both before and during the marriage. *See id.* at 783–88, 454 N.W.2d at 40–42. It is not surprising, then, that we also concluded that the trial court was not required to consider the wife's claimed premarital contributions to the marital estate, as she insisted the court should have done. *See id.* at 789–90, 454 N.W.2d at 42–43.

¶ 34. The present facts are vastly different. During the seven years prior to their marriage, while Joseph pursued his undergraduate and medical education, Julia provided the primary, if not the sole, financial support for the household.[3] And, unlike the Greenwalds, when these parties married, they made no agreement limiting either's claims against the other in the event of the dissolution of their marriage. To the contrary, the trial court found that Julia "shared her bed, home, and income with [Joseph] with the expectation that some day she would be a doctor's wife, and that is what she did become."

---

[3] The earnings histories of both parties, as compiled by the Social Security Administration, were introduced as trial exhibits. These exhibits show that from 1986 through 1993, Joseph had total earnings of $15,592, ranging from a low of zero to a high of some six thousand dollars in any one year. Julia, on the other hand, earned a total of $151,773 during those eight years, never less than eleven thousand dollars in any year, and over $24,000 in two of the years. These are the years prior to the parties' marriage in 1993 during which Joseph completed his undergraduate degree and attended medical school, and during which the trial court found that he and Julia shared a household.

¶ 35. In short, I do not read our discussion in *Greenwald* to stand for the proposition that a trial court, when determining maintenance in a divorce action, may never consider the premarital contributions of one spouse to the education and increased earning capacity of the other spouse, regardless of the facts before it. Thus, I would hold that *Greenwald* is distinguishable on the present facts, and that the trial court did not err in giving some consideration to Julia's substantial contributions to Joseph's education and earning power during the seven years of their relationship which predated their marriage. Affirming the trial court's exercise of discretion in this case would not revolutionize family law, devalue the institution of marriage or create disincentives for persons to marry. It would simply confirm that when determining maintenance in a divorce action, a trial court may, but need not, consider the contributions by one spouse to the education and increased earning power of the other spouse, over the entire relationship of the parties.[4]

---

[4] If *Greenwald's* legacy is indeed what the majority concludes it is, I believe that we wrongly decided the issue. We acknowledged in *Greenwald* that the supreme court had not addressed the issue of maintenance in *Watts*, and further that the holding in *Watts* applied only to never-married cohabitants. *Greenwald v. Greenwald*, 154 Wis. 2d 767, 790, 454 N.W.2d 34, 43 (Ct. App. 1990). We were nonetheless not "persuaded that the parties' later marriage requires a different result." *Id*. I fail to see why this is so. It is one thing to conclude, as the supreme court did in *Watts*, that the legislature did not intend the property division provisions of the Family Code to apply to "unmarried cohabitants." *See Watts v. Watts*, 137 Wis. 2d 506, 519–20, 405 N.W.2d 303, 309 (1987). It is quite another, however, to conclude that a trial court, when considering an award of maintenance for a married person who is divorcing, may never give any consideration to the premarital contributions of

¶ 36. I also conclude that Julia's claim is sustainable under her alternative rationale—unjust enrichment. Julia pled contractual and unjust enrichment claims for compensation for her premarital contributions to Joseph's education and increased earning power. The trial court permitted her to pursue the unjust enrichment claim along with her claims under ch. 767, STATS. In its decision on maintenance following the final hearing in the divorce, the court acknowledged that it could have rested its maintenance award in part on the unjust enrichment theory, but declined to do so, concluding that the additional rationale was unnecessary. I agree with the trial court in both regards: the maintenance award is a proper exercise of discretion by the trial court in view of the factors under § 767.26, STATS., but if other or additional justification for the award is necessary, the theory of unjust enrichment, as set forth in *Watts*, provides it.

¶ 37. The majority again relies, inappropriately I believe, on a prior opinion of this court in denying Julia relief under a theory of unjust enrichment for the contributions she made to Joseph's education and increased earning capacity prior to the marriage. The majority's reliance on *DeWitt v. DeWitt*, 98 Wis. 2d 44, 296 N.W.2d 761 (Ct. App. 1980), is misplaced. The supreme court has made clear that our holding in *DeWitt* (that "a professional education or the increased earning capacity it confers" is not an asset of the marital estate, subject to division in a divorce action) must be limited to the facts and circumstances of that case:

---

that person to his or her spouse's education and increased earning power. As I have noted, many of the factors under § 767.26, STATS., contain no "during the marriage" limitation, and *Watts* does not require that we insert one.

We believe that our Divorce Reform Act, ch. 105, Laws of 1977, provides a flexible way for trial courts to compensate a spouse in cases of this kind. The *DeWitt* Case, on which the court of appeals relied in reversing the trial court, arose under ch. 247, STATS., 1975. However, the legislature subsequently made numerous changes in the divorce and separation statutes. This case is controlled by the amended statutes and we hold that the trial court properly applied them in awarding compensation to Judy Lundberg.

· In amending these statutes, the legislature made clear its intent that ". . . a spouse who has been handicapped socially and economically by his or her contributions to a marriage shall be compensated for such contributions at the termination of the marriage. . . ." Ch. 105, sec. 1(2), Laws of 1977. Compensation for a person who supports his or her spouse while the spouse is in school can be achieved through both property division and maintenance payments.

*Lundberg v. Lundberg*, 107 Wis. 2d 1, 9–10, 318 N.W.2d 918, 922 (1982). Moreover, the court concluded in *Lundberg* that fairness requires a trial court to consider and compensate a wife for "her costs and foregone opportunities resulting from her support of [her husband] while he was in school," because the husband's "medical degree is the most significant asset of the marriage." *See id.* at 14, 318 N.W.2d at 924.

¶ 38. Thus, *DeWitt* is questionable as precedent following the enactment of ch. 105, Laws of 1977. Furthermore, we did *not* say in *DeWitt* that no consideration could be given to a wife's contributions to her husband's attainment of a professional degree, only that the degree itself was not an asset that could be

213

valued and divided under the existing property division statute:

> While we hold that the trial court erred in valuing the [husband]'s law degree as an asset of the marital estate, it is our opinion that both the [wife]'s financial contributions to the family while he obtained it and the present disparity in the parties' income earning capacities resulting from the postponement of the [wife]'s own education are appropriate factors for consideration in arriving at a property division, and in determining whether alimony (now "maintenance") is appropriate.

*DeWitt*, 98 Wis. 2d at 60, 296 N.W.2d at 769. Judge Dykman, in a concurrence, would have gone even further. He would have allowed the valuation of the law degree and its division as a marital asset, concluding that merely considering the wife's contribution to the attainment of the degree for purposes of property division or maintenance presents "difficulties" in certain cases. *See DeWitt*, 98 Wis. 2d at 63–65, 296 N.W.2d at 770–71 (Dykman, J., concurring).[5]

¶ 39. The circumstances which concerned Judge Dykman then are similar to those before us now:

> It is common to find couples with no property or children, where one spouse is gainfully employed while the other obtains an education. If the divorce is obtained upon receipt of the degree, there are no significant assets which the court can award the supporting spouse as compensation. The supporting spouse would have a difficult time establishing need for maintenance payments if he or she is employed

---

[5] The supreme court cited Judge Dykman's concurrence in *DeWitt* with approval in *Lundberg v. Lundberg*, 107 Wis. 2d 1, 7, 318 N.W.2d 918, 921 (1982).

and there are no children. Thus, the court's inability to consider the degree as a marital asset would result in a situation in which the income of one spouse is used for the benefit of the other spouse with no method of allowing compensation.

*Id.* at 65–66, 296 N.W.2d at 771 (Dykman, J., concurring).

¶ 40. Fortunately, in this case, the trial court was able to compensate Julia for her contributions to Joseph's medical education and increased earning capacity by awarding her maintenance. In so doing, the trial court in no way violated our holding in *DeWitt*—the court placed no dollar value on Joseph's medical degree, nor did it attempt to divide it as a marital asset. Awarding maintenance on the present facts is not only consistent with what the *DeWitt* majority cited as a proper alternative to the treatment of a professional degree as property, but it also comports with the supreme court's subsequent discussion of the issue in *Lundberg*. Thus, unlike the present majority, I conclude that if the trial court was precluded from considering Julia's premarital contributions to Joseph's education and increased earning capacity directly under § 767.26(9) and (10), STATS., the court could properly do so in the context of Julia's unjust enrichment claim. And, consistent with the supreme court's holdings in *Watts* and *Lundberg*, the court did not err in compensating Julia by awarding her maintenance for a limited term following the parties' divorce, as a remedy for what would otherwise be Joseph's unjust enrichment.

¶ 41. Finally, I encourage the supreme court to accept this case for review, if Julia requests the court to do so. Whether I or other members of this court like it or not, cohabitation before marriage is no longer

regarded by society as the rare exception to a general rule of proper behavior for young adults. Many couples today begin their lives together as the Meyers did, by establishing a household prior to formalizing their relationship through marriage. In the process, they often acquire and commingle significant assets, and they embark on arrangements such as that before us, where one party supports and assists the other in obtaining or completing an education. If such a couple chooses never to marry, the law is well-settled that the relief and remedies made available to the parties under *Watts* and its progeny remain separate and distinct from those set forth in ch. 767, STATS. However, when a couple chooses to marry, and in so doing becomes bound by ch. 767, the law is not quite so clear. The supreme court should clarify whether a trial court may consider the entire history of the parties' relationship when applying the factors under § 767.26, STATS., as I believe it may, or if the court must close its eyes to everything that occurred between the parties prior to their marriage, as the majority holds.